UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| CATHY WILCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:07-CV-262 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Cathy Wilcher appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the reasons set forth herein, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Wilcher applied for DIB on January 29, 2004, alleging that she became disabled as of February 6, 1999. (Tr. 37-39A.) The Commissioner denied her application initially and upon reconsideration. (Tr. 32-33.) On February 9, 2006, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Wilcher, who was represented by counsel, Wilcher's husband, and a vocational expert ("VE") testified. (Tr. 284-311.) On September 22, 2006, the ALJ rendered an unfavorable decision to Wilcher (Tr. 11-21), which became the Commissioner's final decision after the Appeals Council denied her subsequent request for

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

review (Tr. 3-10).

Wilcher filed a complaint with this Court on October 22, 2007, seeking relief from the Commissioner's final decision. (Docket # 1.) Her sole contention is that the ALJ improperly evaluated the credibility of her symptom testimony. (Opening Br. in Soc. Sec. Appeal Pursuant to L.R. 7.3 ("Opening Br.") 9-11.)

## II.  FACTUAL BACKGROUND[2]

### A.  General Background

Wilcher was fifty-one years old at the time of her hearing before the ALJ. (Tr. 37, 288.) She has a high school education, having obtained a GED, and one year of college. (Tr. 53.) She has twenty years of past relevant work experience as a buyer for a manufacturing company. (Tr. 48, 60-61, 87.) In her Disability Report, she alleged severe pain and numbness in connection with her spinal fusion, bone graft, metal cage, and nuts and bolts (Tr. 47), and then specified in her Opening Brief "post posterior interbody fusion at L5-S1, low back pain, right knee pain, and left shoulder pain" (Opening Br. 2).

### B.  Wilcher's Hearing Testimony

Wilcher testified that she is unable to work primarily due to "constant pain" in her back and legs. (Tr. 290.) She described the pain on good days and bad using a subjective pain scale: on a good day, it is continuously at a level of four out of ten; on a bad day it is around an eight. (Tr. 291.) She elaborated that she has between twelve and fifteen "bad days" each month, and that shooting pain radiates down her hip and thigh in both legs, but most frequently the right.

---

[2] The administrative record in this case is 311 pages, and the parties' disputes involve only small portions of it, that is, the ALJ's finding that Wilcher's symptom testimony was not entirely credible. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

2

(Tr. 291.)  She explained that the pain has worsened since her surgery, and although her doctor has suggested removing the metal hardware, she is opposed to undergoing further surgery.  (Tr. 291-92.)  She also mentioned that her leg often goes numb, particularly if she has been in the same position for awhile.  (Tr. 292.)  Wilcher also testified that to relieve the pain, she takes ibuprofen and tries to find a comfortable position, often lying down.  (Tr. 293.)  On a good day, she lies down for ten to fifteen minutes every hour and a half to two hours, and when the pain is bad, she might lie down for six hours out of an eight hour day.  (Tr. 293-94.)

   She also explained that she experiences radiating pain in her left shoulder that causes her arm to feel weak and limits her range of motion.  (Tr. 294.)  She stated that she usually cannot lift her arm over shoulder-level.  (Tr. 294.)  She further mentioned that she has knee pain that is exacerbated with walking and standing for long periods, but she is not being treated for it because "it's secondary to the other problems" and she is not interested in pursuing surgery.  (Tr. 295.)  According to Wilcher, she can sit for about fifteen minutes at a time before alternating with another position, such as standing or lying down.  (Tr. 295.)  She testified that she only stands for five minutes at a time and that she tries to walk a little bit each day, going to the stop sign on the corner of her street and back.  (Tr. 295-96.)

   When questioned about her lifting ability, Wilcher stated that she does not believe she "can really lift anything comfortably" and that she would hurt herself if she lifted things.  (Tr. 296.)  The heaviest household item she lifts is a gallon of milk.  (Tr. 296.)  The ALJ also asked Wilcher to describe her daily activities, and she replied that she tries "to do normal household things" like dusting, dishwashing, and laundry, but she cannot carry the laundry and she does not vacuum.  (Tr. 298.)  She stated that she does some grocery shopping on her own and cooks

3

occasionally, and if she drives it is only locally because it is too uncomfortable on her back and leg.  (Tr. 298-99.)  Wilcher further elaborated that she can take care of most of her personal needs herself, although she sometimes needs help with her shoes and socks and getting into the tub or shower, and she has a stool in the shower for assistance.  (Tr. 299.)  She explained that she sometimes needs help getting up after lying down for awhile.  (Tr. 299-300.)

With respect to hobbies, Wilcher stated that she likes doing activities on the computer for short periods of time, two to three times per day.  (Tr. 300.)  She elaborated that she used to play golf and tennis but has given them up since her alleged onset date, and has not taken any vacations since then either.  (Tr. 300-01.)  Her social activities are visiting her daughter and other family who live nearby.  (Tr. 301.)

*C.  Summary of Relevant Medical Evidence*

1.   Dr. Lisa Booth, September 1999 to August 2005

Wilcher began seeing Lisa Booth, M.D., in September 1999, who she saw for various ailments through August 2005, including tennis elbow (Tr. 124), left shoulder bursitis (Tr. 118), back pain (Tr. 114, 119), numbness in her leg (Tr. 114), fatigue (Tr. 122), dermatitis (Tr. 122), anxiety (Tr. 225), and respiratory problems (Tr. 119).  In December 2000, Dr. Booth referred Wilcher to Dr. Robert Shugart, an orthopedist at Fort Wayne Orthopaedics, for her back pain. (Tr. 119.)

In August 2005, Dr. Booth completed a "Physician's Statement of Eligibility to Do Work Related Activities" (Tr. 218-22), opining that Wilcher had the following limitations: lifting and/or carrying nothing; standing and/or walking less than two hours in an eight hour workday; sitting less than six hours in an eight hour workday; limited pushing or pulling; only occasionally

4

climbing ramps and stairs and never ladders, ropes, or scaffolds; never balancing, kneeling, crouching, crawling, or stooping; only occasionally reaching, handling, or fingering; and limited exposure to temperature extremes, vibrations, and hazards. (Tr. 218-21.) Dr. Booth further noted that her symptoms would constantly interfere with her attention and concentration (over two-thirds of an eight hour workday), that Wilcher would constantly need unscheduled breaks and rest, and that she would miss work more than three days a month. (Tr. 221-22.)

      2.     <u>Fort Wayne Orthopaedics from January 2001 to May 2004</u>

In January 2001, Wilcher began visiting Robert Shugart, M.D., for complaints of back and leg pain with numbness, which she reported began in September 2000 and had been intermittent for at least the year before that. (Tr. 188.) Physical exam revealed low back pain, but no motor or sensory deficits were detected. (Tr. 189.) Flip testing caused back pain. (Tr. 189.) A December 2000 MRI showed degeneration at L5-S1, but the other levels looked good. (Tr. 189.) Dr. Shugart diagnosed discogenic back pain likely at L5-S1 and recommended a discography, noting that Wilcher's condition was long-term and incapacitating and that "[s]he cannot really do too much[.]" (Tr. 189.)

A few weeks later, Wilcher underwent the discogram, revealing that the L5-S1 disc was contributing to her clinical symptom complex, but the L4-5 disc was not. (Tr. 185.) She saw Dr. Shugart that same day, who recommended posterior lumbar interbody fusion at L5-S1, which he believed would resolve her symptoms. (Tr. 181.) She agreed to the surgery. (Tr. 181.)

Wilcher had back surgery on February 19, 2001. (Tr. 175.) She reported improvement to Dr. Shugart a few weeks later, and he noted that the x-rays look good, the instrumentation was in place, and there was a good amount of graft. (Tr. 175.) He also allowed her to drive, but

5

restricted her to lifting ten pounds with no repetitive twisting and prescribed physical therapy. (Tr. 175.)  Wilcher returned in April, and Dr. Shugart found that she was about eighty percent better. (Tr. 173.)  She had been doing home therapy and was off medications. (Tr. 173.)  He increased her lifting limitations to the range of twenty to twenty-five pounds. (Tr. 173.) Another visit in mid-May revealed that her x-rays looked good and that she had a nice fusion. (Tr. 171.)  She again reported feeling better, and Dr. Shugart decided to increase her activities. (Tr. 171.)

   Dr. Shugart saw Wilcher again in October after she sustained a fall. (Tr. 166.)  The accident apparently exacerbated pain in her back, neck, and right hip, and she had developed some numbness in the right leg, inner thigh, and potentially in the L5 distribution. (Tr. 166.) She took Vioxx without any relief. (Tr. 166.)  The x-rays showed no arthritis in the hip and no obvious fracture. (Tr. 166.)  Hoping that Wilcher did not injure the L4-5 level, Dr. Shugart ordered a MRI and prescribed her medication. (Tr. 166.)  He saw Wilcher again in November, reporting that her current MRI looked good, although she had a little bulge on the L4-5 level. (Tr. 464.)  On physical exam he noted that the pain was still somewhat at L5 mediated on the right, but he opined that there was no injury to the old level or a bad injury above it and she would get better with time. (Tr. 464.)  He decided to continue with anti-inflammatory medication, but if things did not improve he would consider an L4 block on the left. (Tr. 464.)

   Wilcher returned to Fort Wayne Orthopaedics to see Paul J. Almdale, M.D., in June 2002 for evaluation of her right knee and left shoulder. (Tr. 161.)  She reported that eight to ten weeks prior she had an onset of left shoulder and right knee pain without injury or provocation, with a loss of range in motion in both areas. (Tr. 161.)  Her shoulder pain was diffuse and especially

6

notable with overhead activity, as her right knee pain was with flexion. (Tr. 161.) Vioxx provided some benefit. (Tr. 161.) On physical exam her left shoulder had "155 degrees of forward flexion, 160 plus of abduction, 75 external rotation, and T10-12 internal rotation." (Tr. 161.) Strength testing revealed no marked deficits, but she was generally weaker on the left side. (Tr. 161.) The right knee examination demonstrated full extension and 150 degrees of flexion. (Tr. 161.) X-rays of both the shoulder and the knee were normal. (Tr. 162.) His diagnosis was multi joint arthropathy and possible bursitis of the left shoulder. (Tr. 162.)

Dr. Almdale saw Wilcher again in July, and she reported some side effects of her medication and other problems. (Tr. 158.) Although she needed to stop her medication course early, her shoulder pain actually improved. (Tr. 158.) Her knee pain persisted, however, so the doctor decided to obtain an MRI. (Tr. 158.) Laboratory evaluation including rheumatoid factor was negative, sedimentation rate was also negative, and an ANA which was a screen titer was 1.12, which was high. (Tr. 158.) Dr. Almdale considered a rheumatology evaluation. (Tr. 158.) She visited Dr. Almdale again in July, and he noted that her MRI did not show a meniscal tear, but there was some fluid inside the knee. (Tr. 156.) His impression was arthropathy. (Tr. 156.)

In January 2004 Dr. Shugart saw Wilcher for back and leg pain that worsened on extension. (Tr. 144.) An MRI performed that month showed good fusion, and Dr. Shugart was "not impressed" by degeneration at 4-5. (Tr. 144.) He also noted some facet arthropathy at 4-5 and told Wilcher that he thought that might be the cause of her pain and they could consider medial branch blocks. (Tr. 144.) If that helped, rhizotomies might give her long-term relief. (Tr. 144.) She was seen again in May, and Dr. Shugart recorded that he reviewed an MRI that looked good except for some facet degeneration at L4-5 and a little bulge at L4-5. (Tr. 142.) In

7

his opinion, there were two possible causes of Wilcher's pain – the facets or the hardware. (Tr. 142.) On exam she was tender right over the instrumentation. (Tr. 142.) He recommended a hardware block first to indicate whether the hardware was the problem, and if that did not help, then he would try medial branch blocks. (Tr. 142.)

      3.      <u>State Agency Doctors W. Bastnagel and A. Landwehr's Residual Functional Capacity Assessments of March 9, 2004 and May 19, 2004</u>

On March 9, 2004, consulting physician Dr. Bastnagel reviewed Wilcher's record for the state agency and found that she could perform light work: occasionally lift or carry twenty pounds; frequently lift or carry up to ten pounds; stand or walk about six hours in eight hour workday; sit about six hours in an eight hour workday; and only occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 201-08.)

Dr. A. Landwehr affirmed the opinion as written on May 19, 2004. (Tr. 208.) However, he apparently completed a similar form on the same date, making several changes. (Tr. 210.) On this form, he wrote that Wilcher could stand or walk for at least two hours in an eight hour workday; never climb ladders, ropes, scaffolds; and never crawl. (Tr. 210-11.) He further determined that Wilcher had environmental limitations including the need to avoid concentrated exposure to wetness, noise, vibration, and hazards (such as machinery and heights). (Tr. 213.)

      4.      <u>Dr. Thomas P. Barbour, Consultative Physical Exam on May 10, 2004</u>

On May 10, 2004, Wilcher underwent a consultative examination with Dr. Barbour in connection with her DIB claim. (Tr. 199-200.) Wilcher reported that she had been unable to do normal activities at home and at work due to severe back pain. (Tr. 199.) She stated that the fusion surgery was not helpful and the pain continued to worsen since 2001, occurring daily, radiating down her legs, and exacerbated by any daily living activities. (Tr. 199.) She stated

8

that she avoids all activities that required any repetitive lifting, bending, pulling or squatting. (Tr. 119.)  Wilcher explained that she had tried Vicodin, Relafen, Vioxx, and other anti-inflammatory medicines without success, and occasionally uses Darvocet.  (Tr. 199.)  At that time, she was being prepared for possible back injections.  (Tr. 199.)

On physical exam, Wilcher had wide-based gait with a moderately severe limp, favoring the right side.  (Tr. 199.)  She had moderate to severe difficulty getting on and off the examination table.  (Tr. 199.)  Musculoskeletal examination showed that she was unable to walk on her heels or toes, tandem walk, or hop or squat.  (Tr. 199A.)  The active range of motion of the vertebral column and extremities was unremarkable except that movement of lumbar spine was difficult with severe pain; forward flexion was forty-five degrees, extension was zero degrees, and lateral flexion was zero to ten degrees.  (Tr. 199A.)  Hip movement was limited due to its causing severe low back pain, and muscular strength was normal in all areas except in the hip flexors and thighs.  (Tr. 199A.)  Dr. Barbour's diagnosis was chronic back pain, despite her treatments, and most likely secondary to degenerative joint disease and radiculopathy.  (Tr. 199A.)  He found that this continued to interfere with daily activities, and her progress for further improvement was very poor, if not zero.  (Tr. 199A.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind

9

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

10

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

The ALJ rendered his decision on September 22, 2006. (Tr. 11-21.) At step one of the five step analysis, he found that Wilcher had not engaged in any substantial gainful activity since her alleged onset date. (Tr. 16.) At step two, he found that Wilcher had a severe impairment of status post lumbar spine fusion with chronic low back pain. (Tr. 16.) At step three, the ALJ determined that Wilcher did not have an impairment or combination of impairments that meet or equal a listing. (Tr. 18.) Before proceeding to step four, the ALJ found that Wilcher has the following RFC: "[T]he claimant had the [RFC] to perform light work with unskilled simple, routine and repetitive tasks. She can do no climbing of ladders, ropes and scaffolds, no crouching as a job requirement and must avoid concentrated exposure to wetness, vibration, fumes, odors, dust, gases and poor ventilation, and must avoid uneven slippery floor surfaces.

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

11

She is limited to occasional operation of foot controls and limited to occasional working overhead with the left arm." (Tr. 18.)  The ALJ also concluded that although Wilcher's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (Tr. 19.)

Based on this RFC and the VE's testimony, the ALJ found at step four that Wilcher is unable to perform her past relevant work as a buyer for a manufacturing company. (Tr. 19.)  At step five, however, he found that a significant number of jobs exist in the national economy for someone with her age, education, work experience, and RFC, such as small parts assembler, small products assembler, and sub assembler. (Tr. 20.)  He further determined that she could perform these jobs even if she was restricted to sitting and standing for thirty minutes at one time, and moreover, even if she was restricted to sedentary work, "there remains a significant number of job opportunities that [Wilcher] could perform even after attaining age 50, consistent with . . . her age, impairment and functional limitations." (Tr. 20.)  Therefore, Wilcher's claims for DIB were denied. (Tr. 20.)

### C.  The ALJ's Credibility Determination Will Be Overturned

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference.  *Powers*, 207 F.3d at 435.  If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge from the evidence to [the] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal

quotation and citation omitted), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ determined that Wilcher's impairment could reasonably expect to produce her symptoms, but her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 19.) Two sentences then comprised his entire credibility analysis:

> "The claimant's testimony of severe back pain that preclude[s] all work activity was not fully credible and was not supported by the objective medical evidence in the claim file and her medical treatment history. According to her treating orthopedist, based on x-rays and MRI findings, the clinical signs and findings are not supportive of pain to the degree alleged."

(Tr. 19.)

Wilcher argues that the ALJ failed to properly evaluate her symptom testimony. Specifically, Wilcher maintains that the ALJ incorrectly concluded that the treating orthopedist was unsupportive of her allegations of pain based on laboratory and clinical findings, and that the ALJ also failed to consider her daily activities which bolster her pain allegations. Ultimately, Wilcher's arguments are meritorious. Indeed, the ALJ's reasoning is "patently wrong," *Powers*, 207 F.3d at 435, as he has mischaracterized the evidence of record, *see Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (finding that ALJ's decision was not supported by substantial evidence where the ALJ had mischaracterized the medical evidence).

To begin, the ALJ suggests that Wilcher's treating orthopedist found that "the clinical signs and findings are not supportive of pain to the degree alleged." Dr. Shugart, however, did

13

not make any such statement, and in fact actually concluded that there are two possible explanations for her pain.  Dr. Shugart first reviewed the results of her MRI, which were good save facet degeneration and a little bulge at 4-5.  (Tr. 142.)  He then stated, "I told Cathy *there are two things causing [the pain]*, we could think about facets, and we would think about potential hardware pain."  (Tr. 142.)  He further noted that she was tender "right over the instrumentation," and suggested a course of treatment to identify which of the ailments were the cause.  (Tr. 142.)  Dr. Shugart's notes, therefore, indicated that one of two things – either the facet arthropathy or the hardware – was the source of pain.

Thus, contrary to the ALJ's statement, Dr. Shugart *specifically acknowledged* other possible causes of Wilcher's pain not indicated by her MRIs and x-rays, and never stated that her clinical findings were not supportive of severe pain.  The evidence of record therefore defies the grounds upon which the ALJ rested his credibility determination.  *See* SSR 96-7p ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record . . . .").  In focusing solely on the results of the MRI and x-rays, the ALJ has selected evidence favoring his ultimate conclusion while failing to consider the doctor's other findings about the source of Wilcher's pain.  *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Although a written evaluation of each piece of evidence or testimony is not required, . . . neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." (citation omitted)).  The ALJ's determination that "[a]ccording to her treating orthopedist, based on x-rays and MRI findings, the clinical signs and findings are not supportive of pain to the degree alleged" (Tr. 19), misconstrues the doctor's findings and therefore is "patently wrong."  *Powers*, 207 F.3d at 435;  *Steele*, 290 F.3d at 940.

14

Moreover, the ALJ must consider, in addition to the objective medical evidence, the entire case record to determine whether the claimant's statements are credible. *Luna*, 22 F.3d at 691. "Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities." *Id*.; 20 C.F.R. § 404.1529(c); SSR 97-6p. Although the ALJ is not required to "analyze or elaborate on each of [these] factors," he should "discuss most of the factors and connect them to the credibility determination." *Wirth*, 318 F. Supp. 2d at 743.

Beyond objective medical evidence, the ALJ also discredits Wilcher on the basis that her allegations of pain are not supported by her medical treatment history (Tr. 19), which, as we mentioned, is one of the factors for the ALJ to consider in engaging in his credibility determination. 20 C.F.R. § 404.1529(c)(3)(v); SSR 97-6p (listing "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms" among the factors the ALJ must consider in addition to objective medical evidence in assessing credibility). However, the ALJ is also required "to build an accurate and logical bridge from the evidence to [his] conclusions so that we may afford the claimant meaningful review[,]" *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003), and here, the ALJ does not articulate any reasoning how Wilcher's treatment history undermines her credibility. Although the Commissioner attempts to dispel Wilcher's assertions of error by arguing that substantial evidence nevertheless supports the ALJ's ultimate conclusion, "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to

15

the reasons supplied by the ALJ." *Steele*, 290 F.3d at 941; *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Mirza v. Barnhart*, No. 00 C 8003, 2002 WL 731781, at *7 (N.D. Ill. Apr. 25, 2002) ("[T]he Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision.").

In addition, the ALJ not only neglected to articulate his analysis of Wilcher's treatment history; he also failed to discuss the *other* credibility factors. For example, the ALJ does not even mention Wilcher's activities of daily living. *See* 20 C.F.R. § 404.1529(c)(i) (including daily activities among the factors to be considered); SSR 97-6p. At the hearing, Wilcher testified that she cannot vacuum or lift or carry much at all, that she needs help with household chores and some personal care activities, and that her ability to drive is limited to local destinations due to back and leg discomfort. Yet, the ALJ's opinion is devoid of *any* discussion of her daily activities, let alone in connection with the credibility determination. 20 C.F.R. § 404.1529(c)(3)(i); SSR 97-6p; *see also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether it was even considered). The ALJ apparently did not consider this factor or the remaining others when assessing her credibility, or, at the very least, did not articulate his analysis with respect to them. In consequence of the ALJ's scant credibility analysis, lacking adequate discussion of any of the 20 C.F.R. § 404.1529(c)(3) credibility factors, a remand is proper.

In sum, the ALJ failed to meet his burden of articulation, *Blakes ex rel. Wolfe*, 331 F.3d

16

at 569 ("We require the ALJ to build an accurate and logical bridge from the evidence to [his] conclusions so that w6e may afford the claimant meaningful review . . . ."), and where he did provide some reasoning, it was "patently wrong," *Powers*, 207 F.3d at 435.  Accordingly, we remand Wilcher's case.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Wilcher and against the Commissioner.

SO ORDERED.

Enter for this 14th day of July, 2008.

<u>S/Roger B. Cosbey</u>
Roger B. Cosbey,
United States Magistrate Judge